**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **AMANDA MAE MELTON** | § | **CASE NO. 25-43217-elm7** |
| | § | |
| *Debtor,* | § | **CHAPTER 7** |
| | § | |
| **RICHARD KEVIN BROWN** | § | **ADVERSARY PROCEEDING** |
| *Plaintiff,* | § | **NO. 25-04149-elm7** |
| | § | |
| **v.** | § | |
| | § | |
| **AMANDA MAE MELTON** | § | |
| *Defendant.* | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS
SECOND AMENDED COMPLAINT**

Plaintiff Richard Kevin Brown ("Plaintiff") files this Response to the Defendant Melton's

Motion to Dismiss Plaintiff's Second Amended Complaint ("Motion"), and respectfully shows

the Court as follows:

**I.  PRELIMINARY STATEMENT**

1.      This Adversary Proceeding does not arise from a "failed business transaction"

between a consumer and a third party, as the Defendant's Motion suggests.  It arises from a

calculated, multi-year scheme to defraud classic car owners—a scheme in which the Debtor,

Amanda Melton, served as an essential "professional front."  While her husband, Steve Melton,

provided the technical background, the Debtor provided the institutional legitimacy.

2.      Defendant's Motion to Dismiss asks this Court to view her conduct in a vacuum,

ignoring the granular, dated, and specific allegations in the Second Amended Complaint

("Complaint") that satisfy the pleading requirements of Rules 8 and 9(b).  The Complaint does

not merely "group" the Meltons; it identifies the specific "Who, What, When, Where, and How" of the Debtor's personal participation—from her use of a government-affiliated email domain to induce a $25,263.54 wire transfer in a mere 37-minute window, to her personal "lulling" tactics used to conceal the conversion of the Plaintiff's property.

3.   Ultimately, the Motion relies on the Court ignoring the reality of the "Sham Enterprise" she promoted.  Under Texas law, when the business entity is a ghost, the individual who "hits send" on the contract is the party in privity.  Under Federal Bankruptcy law, when a debtor reaps a 600% influx of stolen cash while ignoring blatant "red flags" of fraud, that debt is non-dischargeable.  Because the Complaint provides a plausible roadmap of this misconduct, the Motion to Dismiss must be denied.

## II. LEGAL STANDARDS: THE FEDERAL PLEADING YARDSTICK

### A.  Rule 12(b)(6) and the Plausibility Standard.

4.   Federal Rule of Civil Procedure 8(a) requires a claim for relief to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).  Rule 8 does not require detailed factual allegations, but "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

5.   To survive a motion to dismiss under **Fed. R. Civ. P. 12(b)(6)**, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.*, 550 U.S., at 570.  To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including

factual allegations that when assumed to be true 'raise a right to relief above the speculative level."[1]

6.      Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[2]  A court may also consider documents that a defendant attaches to a motion to dismiss if they are referred to in the plaintiff's complaint and are central to the plaintiff's claims.[3]

**B.  Rule 9(b) Particularity.**

7.      "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  "At a minimum, Rule 9(b) requires that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud."[4] The pleader must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent."[5]

### III. THE DEBTOR IS LIABLE UNDER TEXAS SUBSTANTIVE LAW

8.      The Defendant moves to dismiss based on the flawed premise that the Complaint fails to distinguish between the individual actors or provide a plausible basis for liability under

---

[1] *Cuvillier v. Taylor,* 503 F.3d 397, 401 (5th Cir. 2007) (footnote omitted) (quoting *Twombly*, 550 U.S. at 555); see also *S. Scrap Material Co. v. ABC Ins. Co*. (*In re S. Scrap Material Co*.), 541 F.3d 584, 587 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555), cert. denied, 129 S. Ct. 1669 (2009).
[2] *Jenkins v. Tarrant Cnty. Sheriff's Office*, Civil Action 4:21-cv-0910-O (N.D. Tex. Feb 11, 2022), 6 (citing *Randall D. Wolcott, M.D., P.A. v. Sebeli*us, 635 F.3d 757, 763 (5th Cir.2011) (citations omitted).
[3] *Jenkins v. Tarrant Cnty. Sheriff's Office*, Civil Action 4:21-cv-0910-O (N.D. Tex. Feb 11, 2022), 6 (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).
[4] *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 179 (5th Cir. 1997)).
[5] *Williams*, 112 F.3d at 177.

Texas law.  Specifically, the Defendant argues that the Complaint relies on "conclusory labels" and "improper grouping" that fails to satisfy the standards of *Twombly* and *Iqbal*.

9.      These arguments fail as a matter of law. As demonstrated below, the Complaint identifies the specific conduct, knowledge, and intent of Amanda Melton individually. Furthermore, the Defendant's challenge to the "Plausible Basis for Contractual Liability" ignores long-standing Texas precedent regarding sham entities and the personal liability of those who promote them.  Because the Plaintiff has successfully pled the underlying torts of fraud, conversion, and DTPA violations, the derivative claims for conspiracy and joint liability are equally well-founded.

## 1. CONTRACTUAL PRIVITY AND THE "PROMOTER" LIABILITY OF THE DEFENDANT.

10.     The Defendant moves to dismiss for lack of privity, arguing she is a "stranger" to the Service Agreement because her name does not appear on the signature block. (Motion ¶ 40). This argument fails because it relies on the existence of a legitimate business entity that—per the Complaint—does not exist.  Under Texas law, when a "business" is a sham, the individual who orchestrates the deal and transmits the instrument is the party in privity.

### A. Plaintiff Contracted With a Purported Entity—Not Steve Melton Individually

11.     Defendant's primary defense is that Plaintiff contracted with Steve Melton personally. (Motion ¶ 20).  The face of the contract (Compl. Ex. P-001) refutes this.  The contracting party is "Steve's Performance & Restoration."  By identifying Steve Melton as "Owner," the contract objectively represents that the counterparty is a business entity distinct from the individual.  As detailed in the Complaint, the Meltons utilized this "Professional Veneer" (including various assumed names like "Advanced Performance and Restoration") to hide the fact that they were operating a non-existent "Sham Enterprise." (Compl. ¶¶ 10-11, 17).

At the pleading stage, the Court must accept as true that the intended contracting party was an entity, not a natural person.

### B. Promoter Liability: Individuals Acting for a Non-Existent Entity are Personally Liable.

12.    Defendant's privity argument collapses once the central fact alleged in the Complaint is recognized: **the purported business entity did not exist.**

13.    In Texas, where an entity is non-existent, the individuals who purportedly act on its behalf are "promoters."  A promoter who enters into a contract for a non-existent entity is personally liable as a party to that contract.[6]  Because the "Entity" was a ghost, and the Husband never signed the document, the Defendant—as the sole active participant who delivered the instrument and induced the transaction—is the only legal party left standing.  She cannot be a "ministerial messenger" for a principal that does not exist.

14.    At a minimum, these allegations state a plausible claim that Defendant is personally liable on the contract, making dismissal inappropriate under Rule 12(b)(6).

### C. Privity via "Meeting of the Minds" and Delivery.

15.    Defendant asserts that the absence of her name on the contract or her signature is an absolute bar to liability.  This is an inaccurate statement of Texas law.  "The presence or absence of a signature on a contract is relevant... but it is not the only factor."[7]

16.    Privity is established through an objective "meeting of the minds" manifested by the parties' conduct.[8]  The Defendant's conduct manifests such intent to be bound by the contract:

---

[6] *Fish v. Tandy Corp.*, 948 S.W.2d 886, 897 (Tex. App.—Fort Worth 1997, writ denied).
[7] *1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Cap.*, 192 S.W.3d 20, 26 (Tex. App.—Houston [14th Dist.] 2005).
[8] *See David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008).

---

17.    **Delivery and Inducement:** The Defendant was the party who provided the Agreement to the Plaintiff.  The Defendant, conducted such transaction using her official government-affiliated email to provide an air of legitimacy, representing it as a valid instrument for the transaction, and convincing the Plaintiff that this was a real business and not a scam.

18.    By transmitting a contract on behalf of a purported restoration business that did not legally exist, the Defendant did more than merely "relay a document." She represented that a legitimate contracting party stood behind the Agreement. Because no such entity existed, the only parties capable of forming the contract were the natural persons who orchestrated the transaction and solicited payment—specifically, the Defendant.

19.    By being the party who physically or electronically delivered the contract to the Plaintiff for the purpose of inducing performance, the Defendant objectively manifested her assent to the Agreement's terms. She cannot now rely on the absence of her signature—on a document she herself provided—to claim she is a stranger to the transaction. Her delivery of the Agreement and her subsequent conduct constitute the very type of assent "by other means" recognized under Texas law.

20.    **Ratification and Estoppel:** A party who accepts the benefits of a transaction is estopped from denying the validity of the contract. The Defendant cannot deliver a contract, manage the "Financials" for the resulting project, and accept $228,000 in wire transfers into accounts she controlled, while simultaneously claiming she is a "stranger" to the agreement. These actions constitute classic manifestations of assent under Texas law.

### D.  Conclusion of Contractual Liability.

21.    The Contract plausibly alleges that (1) the entity was non-existent; (2) the Defendant delivered the instrument to induce payment; and (3) the Defendant personally

received and managed the resulting funds.  Under the "Promoter" doctrine, the principle of "Assent by Conduct," and the doctrine of ratification, these facts establish a plausible claim of contractual liability against Amanda Melton individually that survives a Rule 12(b)(6) challenge.

### 2. THE DTPA CLAIM AND THE "DECEPTIVE ACT" OF PROFESSIONALISM

22.     The Defendant's argument—that she made no "specific statement" in connection with the sale—ignores the broad remedial purpose of the Texas Deceptive Trade Practices Act (DTPA).  Under the DTPA, a "deceptive act" is not limited to a verbal falsehood; it includes any act or omission that takes advantage of a consumer's lack of knowledge to a grossly unfair degree. Tex. Bus. & Com. Code § 17.45(5).

23.     **Misrepresentation of Business Characteristics**: By transmitting the Service Agreement, purporting to be from a legitimate business from a government-affiliated email (the "What and Where"), the Defendant represented that the venture had a "sponsorship" or "status" of legitimacy it did not possess.

24.     **Unconscionability:** Using her professional reputation to induce and initiate the $228,000 transaction for a non-existent entity, while her husband was actively facing fraud judgments for identical conduct, is the definition of an unconscionable action.

25.     **Reliance:** Plaintiff's reliance is evidenced by the "37-minute window."  The Plaintiff did not wire $25,000 to a stranger; he wired it to the "Partner" who had just provided a professional-looking contract from a trusted institutional email domain.

### 3. COMMON LAW FRAUD: THE "NEWSPAPER STORY" OF DECEPTION.

26.     The Defendant incorrectly asserts that the Complaint lacks the "Who, What, When, Where, and How" required for fraud.  To the contrary, the Complaint does not merely

allege "fraud"; it provides the specific "newspaper-story" details required to satisfy the heightened pleading standards of Rule 9(b):

- **The Who**:  **Amanda Melton.** The Complaint does not simply refer to "the Meltons." It identifies that Amanda Melton utilized her official Stephenville ISD email account (the "Where") to transmit the contract.  The Complaint further alleges that Amanda Melton was a recipient of the funds, and that Amanda Melton was the responsible party in the Sham Enterprise for managing: the financial documents and invoices (¶¶18a, 18d), quality control (¶18b), and clerical duties (¶18c).

- **The What**:  The "What" is the **Affirmative Misrepresentation of Legitimacy**.  By delivering the Service Agreement (the "What") under a professional domain, the Defendant represented that "Steve's Performance & Restoration" was a legitimate, authorized business entity capable of performing the restoration.  In reality, it was a sham enterprise —a mere "prop" used to facilitate theft.

  The "What" also includes the Lulling Representations used to prevent the Plaintiff from discovering the scheme.  This includes the Defendant's false statements and implications that invoices for parts existed and that documentation was being "compressed" for delivery.  These were not mere administrative updates; they were fraudulent statements of current fact intended to induce the Plaintiff's continued inaction while the funds were converted.[9]

- **The When:**  The Complaint provides a precise timeline that the Defendant's Motion largely ignores:

---

[9] The Defendant characterizes these acts as "logistical" or "ministerial." However, a statement regarding the existence of a document (e.g., an invoice or a build sheet) is a representation of fact. Because the "Sham Enterprise" possessed no such records, any representation by the Defendant that she was "working on" or "compressing" such files was a known falsehood at the moment it was made.

---

  o **October 17, 2024 (4:54 PM)**: The delivery of the fraudulent Service
   Agreement and inducement of the first payment.

  o **October 19, 2024**: The receipt of the $20,263.54 wire by the Defendant.

  o **January 20, 2025**: Representations of "Quality Control" authority.

  o **February 20-21, 2025**: The specific "file compression" stalling tactics.

- **The Where:** The "Where" is both **digital and physical**. Digitally, the fraud was perpetrated through the Stephenville ISD email server—a professional platform used to induce trust. The fraud was also perpetrated digitally through Steve Melton's phone, both orally and through text messages. Physically, the funds were directed into an account controlled by the Defendant, providing her with the direct fruit of the fraud.

- **The How:** The "How" is **the "Professional Veneer" Scheme and lulling tactics** to continue the perpetration of the fraud. The Defendant facilitated the fraud by acting as the professional "front" for the Sham Entity. She "handed the victim the prop" (the contract) and then "held the bag" (the bank account) to catch the proceeds.

**A. The Specificity of the October 17th Misrepresentation**

  .  The Complaint identifies a specific 37-minute window on October 17, 2024, where the Defendant's personal outreach (the "How") utilized a non-existent principal (the "What") to trigger an immediate $25,263.54 wire transfer. This is the antithesis of a "vague" or "conclusory" allegation; it is a granular account of a fraudulent inducement.

**B. The Specificity of the February "Operational" Fraud**

  .  The Complaint further identifies the Defendant's role in the "middle-game" of the fraud. When the Plaintiff grew hesitant, the Defendant personally intervened on February 20,

2025, promising to "compress and send files" (Compl. Ex. P-002) to verify progress that did not exist.  By identifying the specific dates, the specific email addresses, and the specific resulting payments, the Plaintiff has provided the Defendant with more than "fair notice"—the Plaintiff has provided a comprehensive timeline of the scheme.

### C. Relaxed Standard for Information in Defendant's Exclusive Control

27.     Furthermore, to the extent the Defendant demands more "particularity" regarding the internal division of labor between the Meltons, the Fifth Circuit recognizes that Rule 9(b) is relaxed where the factual details are "peculiarly within the perpetrator's knowledge."[10]  The Plaintiff has pleaded every fact available via external communication; the remaining details of the Meltons' internal "meeting of the minds" are the proper subject of discovery, not a basis for dismissal.

### 4. CONVERSION

28.     The Debtor argues that the Complaint fails to allege she exercised "dominion or control" over Plaintiff's property. (Motion ¶ 81). This is a demonstrably false characterization of the record.

29.     **Dominion and Control:** The 1967 Chevelle—the primary fruit of the fraud—was recovered at Ms. Melton's residence. (Compl. ¶¶ 2, 32-33).  Notably, Ms. Melton claims in her sworn Bankruptcy Schedules to be the sole owner of this residence.

30.     **Wrongful Retention:** In Texas, while a "demand and refusal" is often required, it is not necessary when the possession was wrongful from the outset or when the defendant's acts amount to a clear repudiation of the owner's rights.[11]

---

[10] *U.S. ex rel. Doe v. Dow Chemical Co.*, 343 F.3d 325, 330 (5th Cir. 2003).
[11] *See Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971)

31.     **The Intent to Conceal:** The Debtor's dominion is evidenced by her failure to list the vehicle on her bankruptcy schedules despite it being physically located at her home. This omission constitutes a "repudiation" of the Plaintiff's title, satisfying the elements of conversion without the need for a formal demand.

## 5.   CIVIL CONSPIRACY AND JOINT LIABILITY

32.     Defendant argues that conspiracy cannot exist absent an underlying tort. (Motion ¶ 91). Plaintiff agrees; however, as demonstrated above, the Complaint plausibly alleges multiple underlying torts (Fraud, DTPA, Conversion) committed by the Debtor both individually and in concert with her husband.

33.     **The Meeting of the Minds:** Defendant characterizes her role as "assisting with communications." This is a sanitized version of the facts. A "meeting of the minds" is rarely proven by direct evidence and is instead inferred from the "badges of fraud."

34.     **Overt Acts:** The Debtor's acts—transmitting the contract via her ISD email, managing the "Financials," and accepting 600% more income than her stated salary—are the "overt acts" of the conspiracy.

35.     **The Sham Business as the "Object":** Defendants continually refer to "business activities" throughout their Motion as a shield. ***There were no "business activities" because there was no "business."*** There was only a combination of two persons using various fictitious names to extract funds from classic car owners. Under Texas law, once the conspiracy is shown, the Debtor is liable for every act done by themselves or their co-conspirator in furtherance of the scheme.[12]

---

[12] *See Tilton v. Marshall*, 925 S.W.2d 672 (Tex. 1996).

### 6. CONCLUSION OF STATE LAW CLAIMS: THE "PROMOTER" AND "AGENT" REALITY

36.     In summary, the Debtor's "No Privity" and "No Statement" defenses rely on the court ignoring the non-existence of the "Entity". When the "Business" is a ghost, the person who "hits send" on the contract is the only legal party left standing.

37.     The Complaint does not "group" the Meltons out of convenience; it groups them because they operated as a single, unified financial unit that reaped $250,000 in benefits from the Plaintiff. Dismissal of these claims is improper because the Complaint provides exactly what Twombly requires: a plausible roadmap of how the Debtor used her professional reputation and resources to facilitate a quarter-million-dollar theft.

### IV. THE DEBT IS NON-DISCHARGEABLE UNDER FEDERAL LAW

37.     While the preceding section establishes the Defendant's liability under Texas substantive law, the inquiry for this Court now shifts to the character of that liability under the Bankruptcy Code. Under 11 U.S.C. § 523, the "fresh start" policy of the bankruptcy system is reserved for the "honest but unfortunate debtor."[13] It does not provide a sanctuary for debts obtained through deception, unconscionable conduct, or the conversion of a creditor's property.

38.     The Defendant seeks to discharge a quarter-million-dollar debt by claiming she was merely a "clerical bystander" to her husband's conduct. However, the federal standards for non-dischargeability do not require the Defendant to be the "lead actor" in the fraud. As demonstrated below, whether through her own direct misrepresentations, her reckless disregard for the truth of the venture she promoted, or the legal imputation of her partner's fraud, the debt is non-dischargeable as a matter of federal law.

---

[13] *Grogan v. Garner*, 498 U.S. 279, (1991).

### 1. THE COMPLAINT PLEADS DIRECT FRAUD BY THE DEBTOR WITH PARTICULARITY.

39.    The Defendant argues that the Complaint fails because it "identifies no statement by Ms. Melton that was false" and "does not identify any actionable misrepresentation" that induced the Plaintiff to transfer funds. (Motion ¶¶ 40-41).  This is a blatant mischaracterization of the record.  The Plaintiff does not rely solely on imputation; the SAC alleges particular facts demonstrating that the Debtor was the direct conduit of the fraud.  Furthermore, the Defendant's argument ignores the "totality of the circumstances" standard under § 523(a)(2)(A), which encompasses conduct, misleading omissions, and silence where there is a duty to speak.

### A. The Transmittal of the Contract was an Affirmative Misrepresentation.

40.    The Defendant's transmittal of the Service Agreement (the "Contract") was not a ministerial or clerical act; it was a material representation of the legitimacy of the venture.  By utilizing her official Stephenville ISD email account—a government-issued, professional domain—to place a fraudulent contract into the stream of commerce, the Debtor provided a "veneer of legitimacy" intended to lower the Plaintiff's guard and induce reliance.

41.    With this act, the Debtor affirmatively represented:

1.  **The Existence of a Legitimate Principal:** She represented that "Steve's Performance & Restoration" was a valid, contracting entity capable of performing high-end restoration.  In reality, it was a non-existent "Sham Enterprise."

2.  **The Authorization of the Transaction:** By delivering a contract that listed Steve Melton as "Owner" while she acted as the correspondent, she represented the existence of an organized business structure that did not exist.

42.    The use of a professional identity to facilitate a fraudulent transaction is an actionable "device" or "scheme" under § 523(a)(2)(A). A defendant who "hands a victim the prop" to facilitate a theft is a primary participant in that theft.

---

**B. The "37-Minute Window": Direct Evidence of Defendant's Inducement and the Immediate Receipt of Funds.**

43.     The Defendants claims that she did not "induce" the Plaintiff to transfer funds is refuted by the clock.  The sequence of events on October 17, 2024, establishes a direct causal link between the Debtor's specific conduct and the Plaintiff's loss:

- **4:54 PM:** The Debtor transmits the Contract to the Plaintiff.  The Contract expressly demands: "Downpayment ($25,263.54) to be wired by Friday, October 18, 2024." (Complaint, Ex. P-002).

- **5:31 PM:** Exactly thirty-seven minutes later, the Plaintiff—relying on the "professional veneer" and the terms provided specifically by the Debtor—responded: "Thank You, Wire Sent." (*Id.*).

44.     The Plaintiff's immediate performance—transferring over $25,000 within the hour—was the direct result of the Debtor's personal outreach.  Most critically, the Defendant was not a mere conduit for the message; she was the intended recipient of the money.  The funds were wired directly into an account over which Amanda Melton exercised access and control. A defendant who uses a professional reputation to deliver a fraudulent contract and then personally receives the resulting wire transfer 37 minutes later is a primary participant in a fraudulent scheme.

**C. Fraud by Omission and The Duty to Disclose.**

45.     Under Texas law, fraud occurs not only through a false statement but also through the failure to disclose material facts when there is a duty to speak.[14]  By transmitting a Service Agreement with a "Downpayment Due" deadline of less than 24 hours, the Debtor created the false impression of a valid, fully-formed agreement.  Defendant had a duty to disclose that the "Entity" was a sham.  Instead, she remained silent to ensure the wire transfer, and the numerous transfers that proceeded it, were completed.

---

[14] *See First State Bank of Miami v. Fatheree*, 847 S.W.2d 391 (Tex. App.—Amarillo 1993, writ denied).

**D. Willful Blindness and Reckless Disregard Established via the "Badges of Fraud."**

46.     Under 11 U.S.C. § 523(a)(2)(A), the "intent to deceive" requirement is satisfied if a debtor makes a representation—or remains silent in the face of a duty to speak—with "reckless disregard for the truth."[15]

47.     The Defendant's claim of "innocent clerical involvement" is mathematically and factually impossible.  The Complaint includes facts that detail a serial, multi-year fraudulent scheme that was a matter of public and criminal record at the very moment the Defendant hit "send" on the Plaintiff's contract.  In this Circuit, a debtor cannot overcome § 523(a)(2)(A) by claiming "subjective ignorance" when the facts providing notice of the fraud are blatant.[16]

### 1. The "Red Flags" of Prior Fraudulent Conduct

47.     The Defendant cannot claim she was an innocent administrative assistant when the venture she was "vouching" for was already a known instrument of fraud.  As included in the Complaint (Ex. P-003, ¶ 22), on October 3, 2024—only two weeks before Defendant transmitted the Contract to Plaintiff—a $120,000 judgment was rendered against Steve Melton and his various fictitious entities for a substantially identical scheme involving a 1969 Mustang. Simultaneously, Steve Melton was facing felony theft charges in Tarrant County for the misappropriation of a 1967 Camaro in April of 2024.  These are not merely "prior bad acts"; they are "badges of fraud" that establish a pre-existing and ongoing intent to defraud classic car owners through the restoration business Amanda and Steve operated together.

48.     Furthermore, since Plaintiff filed their Amended Complaint on March 11, 2026, Plaintiff has learned of a third contemporaneous victim in Parker County, establishing a clear

---

[15] *See In re Selenberg*, 856 F.3d 393, 398-400 (5th Cir. 2017) (holding that reckless disregard for the truth of a representation satisfies the scienter element).
[16] *In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005).

pattern of conduct under Tex. R. Evid. 404(b).

49.     A party who lends their professional identity (via an official government-issued email domain) to a business associate with a public record of theft and fraud—and does so mere days after a major fraud judgment—acts with, at minimum, a reckless disregard for the truth.

### 2.   The Mathematical Impossibility of Obliviousness

50.     The Defendant's "clerical bystander" defense is further dismantled by her own Bankruptcy Schedules.  The Defendant reports a gross monthly income of $5,253.50 ($63,042 annually).  Yet, during a seven-month period, the Plaintiff alone deposited $228,000 into accounts controlled by or associated with the Defendant—an average of $32,571.42 per month.

51.     An individual whose household income suddenly increases by **600%** cannot claim "subjective ignorance" of the source of those funds.  This is especially true in the bankruptcy context, where debtors are expected to have an intimate awareness of their financial condition.  For the Defendant to claim she was unaware that these massive, non-payroll deposits were the result of the "Entity" she was actively promoting is a textbook example of willful blindness.

### 2. THE DEBT IS NON-DISCHARGEABLE VIA IMPUTED FRAUD AND THE *BARTENWERFER* DOCTRINE

52.     Even if the Court were to credit the Defendant's characterization of her role as merely "clerical" or "administrative," the debt remains non-dischargeable as a matter of law. Under both Texas substantive law and federal bankruptcy precedent, the fraud of the Melton enterprise is fully imputed to the Defendant

### A.  Liability Does Not Depend on a "Balance of Bad Acts".

53.     A defendant's liability for a fraudulent scheme does not depend on a "quantitative" comparison of acts between co-conspirators.  Once a party performs an act in

furtherance of a fraudulent scheme, they are jointly and severally liable for the entirety of the resulting debt. *See Tilton*, 925 S.W.2d at 681 (Tex. 1996).

54.     Liability under § 523(a)(2)(A) does not require a "balance of bad acts"; it requires only that the Debtor participated in the scheme that obtained the debt.  As the Supreme Court clarified in "*Bartenwerfer v. Buckley*", 598 U.S. 69 (2023), the focus is on the nature of the debt and the existence of the partnership/agency, not the specific ratio of misrepresentations made by one partner versus another.  Consequently, a single affirmative act—such as the delivery of a fraudulent instrument to a victim—is sufficient to attach full liability for the loss, regardless of whether a co-defendant performed a greater volume of the scheme's overt acts.

**B. Participation in the Benefits Creates Liability as a Principal.**

55.     Texas law is settled: "the partaking of benefits of a fraudulent transaction makes the participants principals and liable as such."[17]  The Complaint alleges that the Defendant did not merely watch the fraud occur; she "partook of the benefits" by:

(1) Accepting $228,000 in wired funds into accounts she accessed and controlled;

(2) Misappropriated those funds; and

(3) Concealing the 1967 Chevelle—the primary fruit of the fraud—at her residence.

56.     Under *Fatheree*, once the Defendant accepted the proceeds of the transaction, she became a principal in the fraud.  "Each party to a fraudulent transaction is responsible for the acts of the others done in furtherance of the fraudulent scheme... and all who participate are liable for the fraud." *Id*. at 396.

---

[17] *First State Bank of Miami*, 847 S.W.2d at 396 (*citing Corpus Christi Teachers C.U. v. Hernandez*, 814 S.W.2d 195, 202).

### C. Imputation Under the *Bartenwerfer* "Partnership" Standard.

57.     The Defendant's liability is further solidified by *Bartenwerfer*, which bars the discharge of any debt "obtained by" fraud, regardless of whether the specific debtor committed the fraud herself, so long as the fraud was committed by a partner or agent acting within the scope of the partnership. 598 U.S. 69.

58.     To avoid the reach of *Bartenwerfer*, the Defendant argues that no partnership existed.  This is a factual impossibility under the Texas Business Organizations Code § 152.052. The Complaint pleads several statutory "Badges of Partnership" that more than satisfy the 12(b)(6) standard:

- **Receipt of Profits and Funding:** The Complaint alleges that funds totaling approximately $228,000 were delivered to an account that Defendant had access and control.  Under Texas law, "receipt of or a right to receive a share of profits of the business" is a prime indicator of partnership.

- **Expression of Intent and Mutual Control**: Steve Melton repeatedly identified the Defendant as the party "working on everything for us," specifically designating her as the person in control of the build sheets, invoices, and quality control. (Complaint, ¶ 18 and Ex. P-002).

- **Contribution of Services:** The Defendant utilized her own professional credentials and employer-issued email domain to deliver the operative contract, a service essential to the venture's acquisition of the Plaintiff's $228,000.

59.     Because the debt was "obtained by" fraud within the scope of the Melton restoration venture, and because the Defendant actively participated in and benefitted from that transaction, the debt is non-dischargeable as to her under § 523(a)(2)(A).  Whether she was the "mastermind" or the "administrative partner" is irrelevant under the Supreme Court's holding in *Bartenwerfer.* The Motion to Dismiss must be denied.

## V. THE SECOND AMENDED COMPLAINT PLAUSIBLY ALLEGES WILLFUL AND MALICIOUS INJURY UNDER § 523(a)(6)

60.     The Defendant attempts to silo the "intent" required for fraud from the "intent" required for willful and malicious injury.  However, the "red flags" included in the Complaint—which establish the Defendant's reckless disregard—simultaneously prove that she acted with an objective substantial certainty that her conduct would cause the Plaintiff financial ruin.

### A. Knowledge of the "Fraudulent Machine" Defines the Certainty of Harm.

61.     Under § 523(a)(6), injury is "willful" when a debtor acts with an objective substantial certainty that harm will occur.[18]

62.     The Defendant was not operating in a vacuum.  Only two weeks prior to inducing the Plaintiff, a $120,000 judgment was entered against the venture for the exact same conduct. When the Defendant utilized her professional SISD email to deliver the Contract to the Plaintiff, she knew—or recklessly ignored—that the venture had a 0% success rate and a 100% rate of litigation and loss for its customers.

63.     Placing a consumer into a business relationship that has already been adjudicated as fraudulent is not "negligence"; it is a "willful" act because the injury (the loss of the consumer's funds) is a mathematical and objective certainty.

### B. Possession and Concealment of the Vehicle and Funds.

64.     The Debtor contends the "Complaint contains no factual assertion that Ms. Melton took custody of the vehicle, stored it, transported it, or otherwise exercised physical possession." (Motion ¶ 67).  Again, this statement demonstrably misstates the record.  The vehicle was recovered at Ms. Melton's **her residence** and **omitted from her sworn Bankruptcy Schedules**. (Complaint ¶¶ 2, 32-332).

---

[18] *In re Miller*, 156 F.3d 598, 606 (5th Cir. 1998).

65.     Notably, this is the same residence the Defendant claims in her Bankruptcy Schedules that she is the sole owner of.  In the Fifth Circuit, the intentional concealment of a creditor's property constitutes a willful and malicious injury. *See In re Miller*, 156 F.3d, at 603. The Defendant cannot claim to be a "clerical bystander" to the storage of a stolen classic car on her own exclusive real property.

### C.  The Influx of Stolen Funds as Notice of Impending Injury.

66.     The Defendant's receipt of $228,000 in a seven-month period—**a 600% increase** over her reported income—provided her with actual notice that the Plaintiff was being "mined" for cash.  A party who knows the "business" is facing felony theft charges, provides the professional "veneer" to keep the victim paying, and directly collects the "bag" of proceeds cannot claim the resulting injury was a surprise.

67.     The Defendant's willful blindness to these red flags is the evidentiary bridge to § 523(a)(6): she "closed her eyes" to the harm she was facilitating, which satisfies the requirement for a willful and malicious injury.[19]

### D.  "Stalling" as Malice: The February 2025 Misrepresentations

68.     Finally, the Defendant's direct representations on February 20-21, 2025— claiming she was "compressing files" to justify the lack of progress—were intentional acts designed to prevent the Plaintiff from discovering the injury and mitigating his damages. This "stalling" was a deliberate choice to prolong the conversion of the Plaintiff's property, squarely meeting the "malicious" prong of § 523(a)(6).

---

[19] *See In re Shcolnik*, 670 F.3d 624, 630 (5th Cir. 2012) (noting that a debtor's actions in a fraudulent scheme can satisfy the "substantial certainty" of willful injury).

## VI. CONCLUSION AND REQUEST FOR DISCOVERY

**69**.    The Debtor seeks dismissal by claiming the Plaintiff lacks "particularity," yet she simultaneously opposes discovery that would reveal the very bank records and internal communications she claims are missing. A motion to dismiss is not a substitute for a trial on the merits, nor is it a vehicle for a Debtor to escape the consequences of a $250,000 fraud by claiming clerical ignorance.

70.    The Second Amended Complaint provides a plausible, granular roadmap of the Defendant's individual participation, her reckless disregard for the truth, and her receipt of the fruits of the fraud.

WHEREFORE, Plaintiff respectfully requests that the Court DENY the Debtor's Motion to Dismiss in its entirety and allow this matter to proceed to discovery.

IN THE ALTERNATIVE, should the Court find any portion of the SAC fails to meet the requisite pleading standards, Plaintiff respectfully requests leave to amend to further specify the agency, partnership, and individual acts of the Defendant. Such amendment would arise out of the same conduct and transactions set forth in the original pleadings and would thus relate back under Fed. R. Civ. P. 15(c).

Respectfully submitted,

THE ALLEN FIRM, P.C.
By:/s/ **Cassie M Meyer**
 Cassie M Meyer, Esq.
 Texas Bar No. 24140549
 Email: cassie@allenlawfirm.com
 181 S. Graham Street
 Stephenville, Texas 76401
 Tel: (254) 965-3185
 Fax: (254) 965-6539
   ATTORNEYS FOR RICHARD KEVIN BROWN,
   CREDITOR

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of April 2026, a true and correct copy of the foregoing PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT was served electronically via the Court's CM/ECF system upon all parties registered to receive electronic notice in this case, including:

Clayton L. Everett
Norred Law, PLLC
clayton@norredlaw.com
*Counsel for Defendant/Debtor*