**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **AMANDA MAE MELTON** | § | **CASE NO. 25-43217-elm7** |
| | § | |
| *Debtor,* | § | **CHAPTER 7** |
| | § | |
| | § | |
| **RICHARD KEVIN BROWN** | § | **ADVERSARY PROCEEDING** |
| *Plaintiff,* | § | **NO. 25-04149-elm7** |
| | § | |
| **v.** | § | |
| | § | |
| **AMANDA MAE MELTON** | § | |
| *Defendant.* | § | |

## PLAINTIFF'S THIRD AMENDED ADVERSARY COMPLAINT

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

NOW COMES RICHARD KEVIN BROWN ("Plaintiff"), and files this Third Amended Adversary Complaint against Defendant **AMANDA MAE MELTON** ("Defendant" or "Debtor"), pursuant to the Court's *Order Conditionally Granting in Part and Denying in Part Defendant's Motion to Dismiss* entered April 24, 2026 (Doc. No. 41), and respectfully shows the Court as follows:

### I.    PRELIMINARY STATEMENT

1.      This is an action to liquidate a debt arising from fraud, larceny, and willful injury, and to deny the Debtor a discharge. This proceeding arises from a continuous course of fraudulent conduct by the Debtor and her husband, Steve Melton, which began with a scheme to defraud the Plaintiff pre-petition and culminated post-petition in the Debtor's bad-faith filing and subsequent false oaths on her bankruptcy schedules.

2. Recent law enforcement actions have confirmed the nature of this scheme: the Debtor's husband was recently arrested on charges of felony theft, and the Plaintiff's property was recovered at the joint residence of the Debtor and her husband. Despite her duty to disclose all assets, the Debtor omitted these recovered items and other high-value assets—including approximately $225,000 in transferred funds and a 1967 Chevrolet Chevelle—from her sworn bankruptcy filings.

## II.   PARTIES, JURISDICTION AND VENUE

3. **Jurisdiction**: This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) (determinations as to the dischargeability of particular debts) and § 157(b)(2)(J) (objections to discharge).

4. **Venue**: Venue is proper in this district pursuant to 28 U.S.C. § 1409(a) as the underlying bankruptcy case is pending in this Court.

5. **Plaintiff**: Plaintiff, RICHARD KEVIN BROWN, is an individual residing in Todos Santos, Baja California Sur, Mexico, and a creditor of the Defendant arising from the misconduct described herein.

6. **Defendant:** Defendant/Debtor, AMANDA MELTON, is the Debtor in the above-captioned Chapter 7 case (Bankr. Case No. 25-43217-elm7), filed on August 24, 2025. Defendant resides in Erath County, Texas.

7. **Relation Back**. Pursuant to Fed. R. Civ. P. 15(c), made applicable by Fed. R. Bankr. P. 7015, the claims asserted herein relate back to the date of Plaintiff's Original Adversary Complaint filed November 25, 2025 (Doc. No. 1). The claims arise out of the same conduct, transactions, and occurrences originally pleaded — namely, the Defendant's pre-petition fraudulent

procurement of funds and property from Plaintiff and her post-petition concealment of the resulting assets.

### III.  STATEMENT OF FACTS

**A.  The Sham Enterprise and the Meltons' Pre-Existing Pattern of Fraud.**

8.      At all times relevant to this Complaint, the Defendant's husband, Steve Wayne Melton ("Steve") operated, and the Defendant participated in operating, an automotive-restoration business under the assumed name "Steve's Performance & Restoration" (the "Sham Enterprise").

9.      The Sham Enterprise was not a legitimate business entity under Texas law at the time relevant to the conduct alleged below.  No filings on record with the Texas Secretary of State or the Texas Comptroller identified "Steve's Performance & Restoration" as a corporation, limited liability company, or other entity providing limited liability to its principals.  Additionally, no filings on record with Erath, Hood, or Tarrant Counties identified "Steve's Performance & Restoration" as a DBA or alias for a different legitimate business entity.

10.     Because the Sham Enterprise had no separate legal existence, all business operations conducted in its name were conducted by the Defendant and Steve directly, in their personal capacities, for their joint benefit, and constituted a general partnership under Tex. Bus. Orgs. Code § 152.051 et seq.

11.     **Steve Melton's Pattern of Shifting Assumed Names**.  Prior to soliciting the Plaintiff, Steve Melton—operating through the Sham Enterprise and various other aliases— defrauded multiple classic-car owners using a substantially identical scheme.  Public records reveal that Melton has a history of operating under a rotating series of fictitious assumed names

to evade legal and financial accountability.  These include "Steve's Performance and Restoration," "Advanced Performance and Restoration," "Advanced Auto Body and Restoration," "Advanced Services," "Advanced Pest Services," and "Advanced Bed Bug & Pest Services, LLC."  The judgments and pending proceedings involving these entities establish a clear and consistent pattern of using shifting identities to insulate himself from the consequences of his fraudulent conduct.

12.     **The October 3, 2024 Mustang Judgment.**  Fourteen (14) days before the Defendant engaged the Plaintiff in the Sham Enterprise, as further alleged below, a Texas state-court judgment entered on October 3, 2024 in the principal amount of approximately $120,000 against Steve Melton for a substantially identical fraud scheme involving a 1969 Ford Mustang.  The judgment was a matter of public record at all times relevant to this Complaint.

13.     **The 1967 Camaro Theft Charge**. During the same period, Steve Melton was the subject of a Tarrant County criminal investigation involving the misappropriation of a client's 1967 Chevrolet Camaro.  The vehicle was delivered to him for restoration in April 2024, and the filed a felony theft complaint against Steve on January 14, 2025.  The filing of this complaint triggered public record notice and legal proceedings that coincide with the fraudulent conduct alleged in this matter.

14.     **The Parker County Victim**. On information and belief, during the same time period Steve Melton also defrauded a third classic-car owner residing in Parker County, Texas, of funds and a vehicle by means of a substantially identical scheme.

15.     Defendant resided with Steve Melton at all times relevant to this Complaint and shared a household, joint accounts, and joint financial control with him.  By virtue of that cohabitation and that joint financial control, Defendant knew of, or with reckless disregard for

the truth ignored, Steve Melton's pattern of operating substantially similar fraud schemes through his "restoration business" under shifting assumed names.

**B. The Defendant's Direct Role and Involvement in the Texas Partnership.**

16.     The Defendant did not act as a passive spouse. To the contrary, the Defendant participated in the Sham Enterprise as a general partner and lent the institutional legitimacy of her employment with the Stephenville Independent School District ("SISD") to the Sham Enterprise's solicitation of customers.

17.     Each of the five statutory factors identified in Tex. Bus. Orgs. Code § 152.052(a) for the existence of a Texas partnership is plausibly alleged here:

a.  **Receipt or right to receive a share of profits of the business** (§ 152.052(a)(1)): During the seven-month period from October 17, 2024 through May 2025, in excess of $228,901.57 in customer funds attributable to the Plaintiff alone was deposited into bank accounts the Defendant accessed and controlled, including the account ending in 9449 to which Plaintiff's $20,263.54 wire transfer of October 19, 2024 was directed (the "Melton Account").

b.  **Expression of an intent to be partners** (§ 152.052(a)(2)): The Defendant held herself out, and was repeatedly held out by Steve Melton, as the operations partner of the Sham Enterprise.   Steve Melton represented to the Plaintiff in writing that "my wife is working on everything for us" (Jan. 20, 2025); that "wife" would email the build sheet and invoice Plaintiff requested before releasing additional funds (Feb. 19–20, 2025); and that "your wife's working on getting them to me" regarding the insurance invoices (Feb. 21, 2025).  Defendant herself, again confirmed her partnership role on February 20, 2025, when she communicated through Steve Melton's mobile-phone channel

directly to the Plaintiff: "Kevin This is Amanda I am compressing these files and as soon as they are done I will make sure they are sent over to you."

c. **Participation or right to participate in control of the business** (§ 152.052(a)(3)): The Defendant exercised actual control over the customer-facing financial documents of the Sham Enterprise.  She prepared and transmitted the Service Agreement (defined below); she was identified to the Plaintiff as the "quality control" partner who would "check everything" on the Plaintiff's vehicle (Jan. 20, 2025); and she controlled access to and retention of the partnership's build sheets, invoices, and progress files.

d. **Agreement to share losses or liability for claims by third parties** (§ 152.052(a)(4)): The Defendant's joint receipt and joint use of customer deposits, her sharing of the marital residence in which the converted Vehicle was concealed, and her sharing of the bank accounts that received the customer deposits all evidence a joint assumption of the financial consequences — both gains and losses — of the Sham Enterprise.

e. **Agreement to contribute or contribution of money or property** (§ 152.052(a)(5)): The Defendant contributed her own professional credentials and her employer-issued government e-mail account at the Stephenville Independent School District (amanda.melton@sville.us) to the Sham Enterprise as the operative communications channel for soliciting customers — a contribution that was essential to the venture's ability to obtain the Plaintiff's funds.

18.     Although no single factor is dispositive under Tex. Bus. Orgs. Code § 152.052(a), the aggregate of these well-pleaded facts — actual receipt of profits, holding-out as partners, exercise of operational control, joint assumption of financial consequences, and

contribution of property — plausibly alleges a Texas general partnership between the Defendant and Steve Melton.

### C. The October 17, 2024 Inducement: Defendant's Affirmative Misrepresentations

19.     On or about October 7, 2024, Steve Melton initiated discussions with the Plaintiff regarding the purchase and restoration of a 1967 Chevrolet Chevelle (the "Vehicle").

20.     On or about October 16, 2024, the Plaintiff purchased the Vehicle in Austin, Texas, for approximately $23,000.00 and immediately delivered the Vehicle to the Sham Enterprise for restoration.

21.     On Thursday, October 17, 2024, at 4:54 p.m. Central Time, the Defendant — personally, using her individual SISD employee e-mail account, transmitted to the Plaintiff an e-mail bearing the subject line "67 Chevelle Service Agreement" and attaching a PDF document captioned "Steve's Performance & Restoration — Service Agreement 1967 Chevrolet Chevelle" (the "Service Agreement").  A true and correct copy of the e-mail and the Service Agreement is incorporated by reference and attached as **Exhibit P-001**.

22.     By that single, deliberate act of transmission, the Defendant — by her conduct — made the following affirmative representations of material fact to the Plaintiff:

   a.  **Existence of a Legitimate Principal:** That "Steve's Performance & Restoration" was a real, organized, and lawfully operating business entity, separate from Steve Melton individually, capable of contracting, performing, and receiving payment for the restoration services described in the Service Agreement.

   b.  **Authority to Transact:** That the Sham Enterprise was authorized to enter into the Service Agreement, to receive the wire transfer demanded therein, and to apply the funds to the parts and labor itemized in the Service Agreement.

c. **Institutional Backing:** By transmitting the Service Agreement from a government-issued e-mail account at a Texas public school district — a domain reasonably associated by ordinary recipients with regulated, accountable, and verifiable institutional employment — the Defendant represented that the Sham Enterprise was a legitimate consumer-facing business worthy of the trust she was placing behind it.

d. **Capacity to Perform:** That the Sham Enterprise had the personnel, expertise, parts inventory, and financial wherewithal to perform the high-end professional restoration of Plaintiff's 1967 Chevelle described in the Service Agreement, including the procurement of more than two dozen specifically itemized OEM-grade parts ("Rear Tail Pan Body Panel"; "Driver Quarter Panel"; "Passenger Quarter Panel"; "Radiator Core Support"; "Digital Gauges"; "Vintage Air Conditioning"; "AutoSound Bluetooth Radio"; etc.).

23.     Each of the foregoing representations was false at the moment the Defendant transmitted the Service Agreement on October 17, 2024 at 4:54 p.m., for the following reasons:

a. **No Legitimate Principal Existed.** "Steve's Performance & Restoration" was not a registered Texas entity. It existed only as a fictitious assumed name used by the Defendant and her husband to obscure their personal liability.

b. **The Venture Had a 0% Performance Record.** Fourteen (14) days earlier, on October 3, 2024, a $120,000 judgment had been entered against Steve Melton for an identical scheme involving a 1969 Mustang.  At the same time, Steve Melton was being investigated for felony theft charges in Tarrant County for the misappropriation of another customer's 1967 Camaro.  Steve Melton — the

principal of the Sham Enterprise the Defendant was vouching for — had a documented track record of taking customer money and vehicles and returning neither, under shifting assumed names, including those identified above.

c. **There Was No Intent to Perform.** As demonstrated by the funds-flow allegations below, neither the Defendant nor Steve Melton intended at the time of the October 17, 2024 e-mail to apply the down-payment to the parts itemized in the Service Agreement, to procure those parts, or to perform the restoration described therein.  Instead, they intended to divert the funds to personal use.

24.     The Defendant knew that the foregoing representations were false at the time of the transmission, or, at minimum, the Defendant transmitted the Service Agreement with reckless disregard for whether they were true or false.  The Defendant's knowledge or reckless disregard is plausibly inferred from — and pleaded by way of — the badges of fraud described above (the October 3, 2024 judgment, the pending Tarrant County felony charge, the cohabitation with Steve Melton, the joint financial accounts, and the 600% sudden increase in joint household receipts that began at and was caused by the Plaintiff's payments).

25.     The Defendant intended that the Plaintiff rely on the foregoing representations, as evidenced by the fact that the Service Agreement she transmitted contained an unusually compressed payment demand requiring a $25,263.54 down-payment to be "wired by Friday, October 18, 2024" — i.e., within roughly twenty-four (24) hours of her transmission — and by the use of her institutional e-mail domain to lend the appearance of legitimacy that would induce immediate compliance.

26.     The Plaintiff justifiably relied on the Defendant's representations.  At 5:31 p.m. Central Time on October 17, 2024 — thirty-seven (37) minutes after the Defendant's

transmission of the Service Agreement — the Plaintiff replied specifically to the Defendant's email with the words: "Thank You, Wire Sent."

### D. Defendant's Receipt of the Fraud Proceeds

27.     On Saturday, October 19, 2024, at 7:30 a.m., the Plaintiff initiated a wire transfer in the amount of $20,263.54 (Confirmation No. OW00005033372390) from his account ending in 5551 to the Melton Account ending in 9449.[1]  The Plaintiff had previously paid an additional $5,000.00 by Zelle transfer to Steve Melton on or about October 18, 2024.

28.     At 7:37 a.m. on October 19, 2024 — seven minutes after the wire was initiated — the Plaintiff personally e-mailed the Wells Fargo wire-transfer confirmation to the Defendant at her school email address, with the message: "Hopefully i got it right this time! Steve this is for the initial deposit (i sent 5k through Zelle yesterday) I will need to spend some time on the TMI interior selections and will get you those funds when we are ready to place the order OK?"  The Defendant received this confirmation.  She did not disclaim ownership of, or access to, the receiving account.  The Defendant accepted the funds.

29.     Over the seven-month period that followed, additional wire transfers and Zelle payments, totaling not less than $228,901.57 were transmitted by the Plaintiff to the Sham Enterprise.  Every dollar of those funds was deposited into accounts that the Defendant accessed and controlled, jointly with her husband.

30.     On May 4, 2026, in response to a subpoena issued by the Plaintiff in Steve's current Adversary Proceeding, First Convenience Bank, a division of First National Bank Texas, produced the underlying account records related to the Plaintiffs' funds and the Melton's bank accounts.  Those records — which Plaintiff incorporates herein by reference

---

[1] Although Plaintiff initiated the wire transfer on October 19, 2025, it was not processed through the banks until October 21, 2025.

and has attached as Exhibit **P-004** — confirm the following well-pleaded facts establishing the Defendant's direct receipt, control, and use of the proceeds of the Sham Enterprise:

a. **Account ending in 9449 (joint account opened April 10, 2024 by the Defendant and Steve Melton).**

   The Defendant and Steve Melton opened this joint account on April 10, 2024—one day prior to the date the State alleges the 1967 Chevrolet Camaro was unlawfully appropriated. This account served as the initial primary repository for the Plaintiff's funds, including the October 19, 2024, wire transfer of $20,263.54. By November 21, 2024—following seven additional wire transfers totaling $84,260.69—the Defendant personally began converting these funds to cash. In a single three-minute window, the Defendant executed two rapid-succession cash withdrawals: $15,000.00 at 13:42 and $4,000.00 at 13:45. The Defendant made a further cash withdrawal of $1,500.00 on December 7, 2024. The Defendant continued to personally manage and transact in this account until February 1, 2025, at which point the account was closed and the balance transferred to opening account 7824, as described below.

b. **Account ending in 8532 (joint account opened March 12, 2024 by the Defendant and Steve Melton).**

   The Defendant and Steve Melton opened this joint account on March 12, 2024. During the period account 9449 was active, funds were transferred from account 9449 into account 8532. On November 21, 2024 — the same day the Defendant withdrew $19,000 in cash from account 9449 — the Defendant also withdrew $2,900.00 from account 8532. Account 8532 was likewise closed in early February 2025 in connection with the opening of account 7824.

c.  **Account ending 7824 (joint account opened in February 2025).**

Steve Melton opened this joint account on February 1, 2024; Amanda was added as an owner to the account on February 4, 2024.  After the closure of accounts 9449 and 8532, the Plaintiff's subsequent payments — consisting of 15 separate Zelle transfers totalling $46,560.88 — were directed into account 7824.

The records reflect the following withdrawals or transfers personally executed by the Defendant from account 7824, by way of example and without limitation: $2,700.00 on February 26, 2025; $505.00 on March 6, 2025; $1,048.44 transferred on March 19, 2025 to a PayPal account in the Defendant's name; $1,520.00 on March 20, 2025; $2,645.00 on March 27, 2025; and $1,000.00 on April 25, 2025.

d.  **Account ending 9275 (Steve Melton, individually and d/b/a "Advanced Pest Services").**

Although account 9275 was not titled in the Defendant's name, the records reflect that funds traceable to the Plaintiff were transferred from joint account 9449 into account 9275 during the period at issue.  The records also reflect that the Defendant knew of, this account, contributed to this account, and upon information and belief, had access to this account.

Account 9275 was the operating account from which the mortgage on the marital residence was paid.  Additionally, on January 18, 2025, Steve Melton issued check no. 131 drawn on this account in the amount of $8,500.00 to "Lynual Brannon," the seller-financer of the marital residence to whom the Defendant and Steve Melton make their mortgage payments, with the memo line "Partial Balloon Payment #1."  On November 26, 2024, the Defendant herself made a $5,000.00 deposit into account

9275, demonstrating that she had ready access to and could personally transact in the account notwithstanding her not being a signatory of record.  Account 9275 was also used to pay for personal goods and services consumed by the Defendant, including, by way of example, payments to nail salons.

**e.  Predominant household use.**

Across all of the accounts identified above, the records reflect that customer funds traceable to the Sham Enterprise — including the Plaintiff's funds — were predominantly applied to the support of the Defendant and Steve Melton's common household, for example: payments to restaurants; payments for groceries and ordinary consumer goods; payments to nail salons and clothing stores; payments for medical appointments and prescriptions; payments for household maintenance and operating costs, such as HVAC repair, propane, and electric bills; and the mortgage payments to Lynual Brannon described above.

31.    Each of the personal withdrawals, transfers, and deposits identified above by the Defendant occurred while the promised parts had not been ordered for the Plaintiff's 1967 Chevelle, while no labor had been performed on the Vehicle, and while the Defendant was simultaneously transmitting or causing to be transmitted to the Plaintiff the lulling representations described below.

32.    During the same seven-month period over which the Plaintiff's deposits described above were made, the Defendant's stated employment income — taken from the $63,042 annual figure later disclosed in her sworn Schedule I — totaled only approximately $36,774.50.  The $228,901.57 in customer funds attributable to the Plaintiff alone therefore exceeded the Defendant's expected employment income over the same seven-month period by

a factor of more than six.  Coupled with the Defendant's personal withdrawals, transfers, and deposits in the receiving accounts identified above, the Defendant could not reasonably have remained ignorant of — nor, in fact, did she remain ignorant of — the source, magnitude, and purpose of those funds.

### E.  The 'Lulling' Period: Defendant's January–February 2025 Misrepresentations

33.    Beginning in January 2025, when the Plaintiff repeatedly demanded invoices for parts and photographic evidence of the Vehicle's progress, the Defendants—acting jointly and in furtherance of their Sham Enterprise—engaged in a calculated campaign of "lulling" representations.  These statements were designed to deceive the Plaintiff into believing the restoration was proceeding as promised.  Plaintiff includes these statements as **Exhibit P-002** and incorporates them herein by reference.  Specifically:

a.  **January 20, 2025** (text message; Steve attributing conduct to the Defendant): "My wife is working on everything for us and will check everything and make sure no name tags are [on] it."  This representation served to assure the Plaintiff that the Defendant was personally performing operational and quality-control functions for the restoration.  The representation was false in that the Defendant was not, in fact, performing operational work on the Vehicle, parts had not been ordered, and the Defendant knew at the time the representation was made that no quality-control work was being performed.

b.  **February 19–20, 2025** (text messages; Steve attributing conduct to the Defendant):  "It should have been sent already by wife earlier today let me check with her... Wife didn't make it back to school yesterday afternoon but today when she gets out of meetings she is emailing it."  This message

represented to the Plaintiff that the build sheet and invoices the Plaintiff had requested before releasing additional funds existed and that the Defendant was about to e-mail them.  The representation was false in that no genuine build sheet and no genuine invoices for parts existed at that time, and the Defendant knew it.

c.  **February 20, 2025** (direct text message from the Defendant): "Kevin This is Amanda I am compressing these files and as soon as they are done I will make sure they are sent over to you."  This message, sent by the Defendant directly and identified by her as authored by her, represented to the Plaintiff that genuine documentation of the Vehicle's restoration progress actually existed in a form ready to be electronically compressed and transmitted.  This representation was objectively and knowingly false. No such files existed, the Defendant was not compressing any documentation, and she had no intent to transmit any such information.  The Defendant made this affirmative misrepresentation to induce the Plaintiff's continued reliance and to delay the discovery of the underlying fraud.

34.    The lulling representations identified above were material to the Plaintiff's ongoing decision to defer legal and contractual remedies against the Sham Enterprise between January and May 2025.  Each misrepresentation was made with the specific intent to delay the Plaintiff's discovery of the fraud, allowing the Defendant and her husband to continue diverting the Plaintiff's funds and to retain unlawful possession of the Vehicle.

35.    The Plaintiff justifiably relied on these representations to his ongoing detriment, a fact evidenced by his contemporaneous communications with the Defendants.  Specifically,

on February 21, 2025, the Plaintiff messaged Steve Melton, stating: "Insurance said we can send pictures once the car is finished, but they do need copies of the invoices and I know your wife's working on getting them to me."

36.     This communication confirms that the Plaintiff remained in the contract and deferred taking adverse action based specifically on the false assurance that the Defendant was actively preparing the requested documentation.  In continuing reliance on these representations of professional "quality control" and administrative progress, the Plaintiff continued making substantial payments to the Sham Enterprise and refrained from demanding the immediate return of the Vehicle and his cash deposits.  Each subsequent payment and each day of lost possession of the Vehicle constitutes a separate item of damage proximately caused by the Defendants' fraudulent lulling campaign.

**F.  Defendant's Possession and Concealment of the Vehicle**

37.     Despite the Plaintiff's demands made beginning in or about May 2025 — communicated by the Plaintiff to the Defendant and Steve Melton both directly and through counsel — the Vehicle, or any parts thereto, has never been returned to the Plaintiff.

38.     Following recent law-enforcement action against Steve Melton in January 2026, the Plaintiff's 1967 Chevelle was physically recovered by law enforcement at the residence the Defendant shares with her husband.  Although, in her sworn Schedule A/B filed in this Bankruptcy Case, the Defendant claimed sole ownership of that residence.

39.     The Defendant did not list the Plaintiff's 1967 Chevelle on her sworn Schedule A/B, Schedule G, or Statement of Financial Affairs in this Bankruptcy Case, despite its physical presence on real property of which she claimed to be the sole owner.  The Defendant's omission of the Vehicle from her sworn schedules constitutes a deliberate act of concealment

and a repudiation of the Plaintiff's ownership rights.

40.     The same residence — the real property the Defendant has sworn she solely owns and on which the converted Vehicle was concealed — is encumbered by a seller-financed mortgage held by Lynual Brannon.  As detailed in **Section III.D** above, on January 18, 2025, Steve Melton issued a check in the amount of $8,500.00, drawn on account 9275, payable to "Lynual Brannon," bearing the memo line "Partial Balloon Payment #1."  Account 9275 was funded, in material part, by transfers from the joint account ending in 9449 into which the Plaintiff's $20,263.54 wire transfer of October 19, 2024 was directly deposited.  The proceeds of the Defendant's and Steve's fraud against the Plaintiff therefore directly contributed to the equity in the residence the Defendant has sworn she solely owns and on which the converted Vehicle was concealed.

### G. The Pre-Petition State Court Action

41.     On July 25, 2025, the Plaintiff filed his Original Petition in the 266th Judicial District Court of Erath County, Texas, Cause No. 25-CVDC-00184, against Steve Melton, the Defendant, and Steve's Performance & Restoration, asserting claims for fraud, DTPA violations, conversion, and civil conspiracy.  A true and correct copy is incorporated by reference as Exhibit P-003.  The Defendants did not answer.  Entry of default judgment was stayed by the filing of the Meltons' bankruptcy petitions.

### H. The Resulting Damages

42.     As a direct and proximate result of the Defendant's individual conduct, and of the conduct of Steve Melton imputed to the Defendant under the partnership and *Bartenwerfer* doctrines, the Plaintiff has sustained actual pecuniary damages of not less than $251,901.57, comprised of: (i) $228,901.57 in misappropriated cash deposits; and (ii) the $23,000.00 value

of the converted 1967 Chevelle.

### I.   Defendant's Concealment of the Receiving Accounts in this Bankruptcy Case

43.     The Defendant's concealment of the Sham Enterprise's assets in this Bankruptcy Case extends beyond the converted Vehicle.  The Defendant has likewise omitted, and made sworn statements inconsistent with the existence of, the very accounts into which the Plaintiff's funds were deposited and from which she personally withdrew, transferred, or deposited cash.

44.     On October 28, 2025, at the meeting of creditors held pursuant to 11 U.S.C. § 341(a), the Defendant testified under oath, in substance, that account 9449 was "her husband's account"; that she "thought" she was on the account but was not certain; and that she did not "use" or "access" the account.  The Defendant did not list account 9449, or any of the accounts indicated in Section III.D above, on her Schedule A/B or Schedule E/F.

45.     At the conclusion of the October 28, 2025 meeting, the Chapter 7 Trustee continued the meeting and directed the Defendant to obtain and produce the records of account 9449 in advance of the continued meeting.

46.      On November 21, 2025, at the continued meeting of creditors, the Defendant testified under oath, in substance, that she had attempted to obtain the records of account 9449 but had been unable to do so.

47.     On May 4, 2026, in response to a Plaintiff's subpoena, the financial institution holding account 9449 produced the records that the Defendant had testified she could not obtain.  Those records establish the matters set forth in **Section III.D** above, including the Defendant's personal cash withdrawals from account 9449 of $15,000.00 and $4,000.00 on November 21, 2024 and $1,500.00 on December 7, 2024, all of which materially contradict the

Defendant's sworn testimony at the October 28, 2025 and November 21, 2025 meetings of creditors.

48.    The Defendant's post-petition concealment evidences her pre-petition intent to defraud the Plaintiff and to deprive him of the funds she had personally received and used. These post-petition acts of concealment were just learned by the Plaintiff and are pleaded in support of the willful-and-malicious-injury element of Plaintiffs claims under Count II (11 U.S.C. § 523(a)(6)); the scienter element of Plaintiffs claims under Count I (11 U.S.C. § 523(a)(2)(A), Count III (Deceptive Trade Practices Act), and Count IV (Common Law Fraud); and the meeting-of-the-minds element of Count VII (Civil Conspiracy).

### IV.   COUNT I:  NON-DISCHARGEABILITY UNDER 11 U.S.C. § 523(A)(2)(A) (FALSE PRETENSES, FALSE REPRESENTATIONS, OR ACTUAL FRAUD)

49.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

50.    11 U.S.C. § 523(a)(2)(A) excepts from discharge any debt for money, property, or services to the extent obtained by "false pretenses, a false representation, or actual fraud."

### A.  Direct Fraud by the Defendant

51.    On October 17, 2024 at 4:54 p.m., the Defendant Amanda Mae Melton, using her SISD employee e-mail account amanda.melton@sville.us, transmitted to the Plaintiff the Service Agreement by which she represented that "Steve's Performance & Restoration" was a legitimate, organized, and capable business entity authorized to perform the high-end restoration of the 1967 Chevelle and to receive the $25,263.54 down-payment demanded therein.

52.    Each representation set forth in **Section III.C** above was false at the time it was made, and the Defendant either knew it was false or made it with reckless disregard for its truth,

for the reasons set forth in **Section III.C** above.

53. The Defendant intended that the Plaintiff rely on those representations, as evidenced by the deliberate use of her institutional e-mail domain, by the time-compressed wire-by-Friday demand embedded in the Service Agreement, and by the immediacy of the resulting reliance (Plaintiff replied "Wire Sent" thirty-seven minutes later).

54. The Plaintiff justifiably relied on the Defendant's representations. The Plaintiff was not in a position to verify the existence or non-existence of the corporate or registered status of "Steve's Performance & Restoration," the bona fides of the Sham Enterprise, or the existence of the prior judgments and pending criminal investigation against Steve Melton, all of which were peculiarly within the Defendant's knowledge.

55. The Defendant's January–February 2025 lulling representations identified in **Section III.E** above were each separate and additional false representations that induced the Plaintiff's continued payments and forbearance from suit. Each such representation was made with knowledge of its falsity and with reckless disregard for the truth, in furtherance of the same fraudulent scheme.

56. As a direct and proximate result of the Defendant's false pretenses, false representations, and actual fraud, the Plaintiff suffered damages of not less than $251,901.57.

### B. Fraud by Omission and Duty to Speak

57. By transmitting the Service Agreement on October 17, 2024 — a document by its terms representing the existence of a legitimate restoration enterprise — and by accepting the resulting wire transfer two days later, the Defendant assumed a duty to disclose facts necessary to make her affirmative representations not misleading.[2]

---

[2] *See*, e.g., *First State Bank of Miami v. Fatheree*, 847 S.W.2d 391 (Tex. App.—Amarillo 1993, writ denied).

58.    The Defendant breached that duty by failing to disclose to the Plaintiff:

- that "Steve's Performance & Restoration" was not a registered or organized business entity;

- that her husband had been adjudicated liable for an identical scheme on October 3, 2024;

- that her husband was facing pending felony theft charges relating to a substantially identical scheme involving a 1967 Camaro; and

- that the funds the Plaintiff was being induced to wire would be diverted from the parts and labor described in the Service Agreement and instead applied to the Defendant's and her husband's personal use.

59.    The Defendant's omissions were material and were made with the intent to induce, and did induce, the Plaintiff to part with his funds and his Vehicle.

### C.    Imputed Fraud Under *Bartenwerfer.*

60.    In the alternative, even if the fact-finder were to conclude that the Defendant did not herself form the requisite scienter at the moment of the October 17, 2024 transmission, the debt is non-dischargeable as to the Defendant under the doctrine articulated by the Supreme Court in *Bartenwerfer v. Buckley*, 598 U.S. 69 (2023), because the debt was "obtained by" actual fraud committed by Steve Melton acting within the scope of the partnership pleaded in **Section III.B** above.

61.    The Defendant accepted the benefits of that fraud by, among other acts, receiving the Plaintiff's $20,263.54 wire into the Melton Account ending in 9449, by accepting and using subsequent payments aggregating not less than $228,901.57, and by retaining and concealing the converted Vehicle on real property she has sworn she solely owns.  Under Texas law, "the

partaking of benefits of a fraudulent transaction makes the participants principals and liable as such."[3]

62.     Accordingly, the entire debt of $251,901.57 — including any treble damages, exemplary damages, attorneys' fees, and costs liquidated through this proceeding — is nondischargeable as to the Defendant pursuant to 11 U.S.C. § 523(a)(2)(A).

## V.     COUNT II: NON-DISCHARGEABILITY UNDER 11 U.S.C. § 523(A)(6) (WILLFUL AND MALICIOUS INJURY)

63.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

64.     11 U.S.C. § 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." Under controlling Fifth Circuit authority, an injury is willful and malicious where the debtor either subjectively intended to cause harm or acted with objective substantial certainty that her conduct would cause harm.[4]

### A.  Willful and Malicious Injury Caused by Fraud

65.     By transmitting the October 17, 2024 Service Agreement she knew (or recklessly disregarded knowing) Plaintiff was being placed into a business relationship that, only fourteen days earlier, had been judicially determined to operate as a fraud against substantially identical customers, the Defendant acted with objective substantial certainty that the Plaintiff would suffer financial harm. The probability of harm was not speculative; it had been adjudicated in the October 3, 2024 Mustang Judgment.

---

[3] *Fatheree*, 847 S.W.2d at 396.
[4] *See* Miller v. J.D. Abrams Inc. (In re Miller), 156 F.3d 598 (5th Cir. 1998); In re Shcolnik, 670 F.3d 624 (5th Cir. 2012).

66.    By participating in and authoring the January–February 2025 lulling representations identified in **Section III.E** above, the Defendant deliberately prolonged the Plaintiff's injury.  Each lulling representation was a willful act intended (or substantially certain) to deprive the Plaintiff of the timely opportunity to demand return of his funds and the Vehicle, to mitigate his damages, or to invoke legal remedies.  Such intentional delay-by-deception independently satisfies the willful-and-malicious-injury standard.[5]

67.    The Defendant's actions were malicious in that they were taken without just cause or excuse: she had no legitimate reason to transmit a contract for a non-existent enterprise on an institutional e-mail account, no legitimate reason to represent that fictional invoices and build sheets existed, and no legitimate reason to retain the Plaintiff's converted property in her residence.

### B.  Willful and Malicious Conversion of the 1967 Chevelle

68.    At all relevant times, Plaintiff was the sole owner of a 1967 Chevelle, which was purchased for $23,000.00 and tendered to the Debtor and her partnership solely for the purpose of restoration. Despite Plaintiff's demands for the return of the Vehicle, the Debtor has refused to return the property and continues to exercise unauthorized dominion and control over it.

69.    The Debtor's retention of the Vehicle—which she notably failed to disclose in her bankruptcy schedules despite its continued presence on her property—constitutes a conversion of Plaintiff's property.

70.    This conversion was willful, as the Debtor intended to exercise control over the Vehicle in a manner inconsistent with Plaintiff's rights.

71.    This conversion was malicious, as the Debtor acted without just cause or excuse.

---

[5] *See In re Shcolnik*, 670 F.3d at 630.

72.    The Debtor knew that depriving the Plaintiff of a classic vehicle valued at $23,000.00 was objectively substantially certain to cause financial harm to the Plaintiff.

**C. Willful and Malicious Misappropriation of Funds.**

73.    Plaintiff paid the Defendant and her partnership a total of approximately $228,901.57 specifically for parts and labor.  The Defendant did not use these funds for their intended purpose.  Instead, the Defendant intentionally misappropriated these funds for other uses, including the Defendant's own personal expenses or those of the undisclosed partnership.

74.    The Defendant's intentional act of requesting and accepting approximately $228,901.57 for specific restoration work, while intending to divert those funds elsewhere, was done with the subjective motive to injure the Plaintiff by depriving him of both his funds and the value of the restoration.

75.    At a minimum, the Defendant acted with objective substantial certainty that taking the funds from the Plaintiff and failing to provide the promised parts or labor would result in significant financial injury.

76.    As a direct and proximate result of the Defendant's willful and malicious conduct, Plaintiff has suffered damages in an amount not less than $251,901.57 (the value of the Vehicle plus the misappropriated funds).

77.    Accordingly, the debt owed to Plaintiff is non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

# STATE LAW CLAIMS

## VI.    COUNT III: VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT (DTPA)

78.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

79.     Plaintiff is a "consumer" within the meaning of Tex. Bus. & Com. Code § 17.45(4) because he sought, by acquiring through purchase, the restoration services described in the Service Agreement — services that were the subject of the Sham Enterprise's solicitation.

80.     The Defendant engaged in the trade or commerce of soliciting, contracting for, and accepting payment for automotive-restoration services within the meaning of Tex. Bus. & Com. Code § 17.45(6).

a. **§ 17.46(b)(2) – Representing that a person has a sponsorship, approval, status, affiliation, or connection which they do not have:** The Defendant misrepresented the status, affiliation, and connection of the Sham Enterprise by utilizing her official government email account (amanda.melton@sville.us) to transmit the Service Agreement and solicit the Plaintiff's funds.  By conducting "Sham Enterprise" business through her Stephenville Independent School District employee account, the Defendant deliberately cloaked the fraudulent scheme in the institutional credibility and "good standing" associated with her public employment.  This use of her official professional status was intended to—and did—mislead the Plaintiff into believing the enterprise was a legitimate, stable business with a connection to a trustworthy public official.  In reality, the Sham Enterprise had no such sponsorship or approval, and the Defendant's use of her employer's resources to further a criminal theft scheme was an unauthorized and deceptive misrepresentation of the business's actual status. (See **Section III.C** above).

b. **§ 17.46(b)(5) – Representing that goods or services have characteristics, uses, or benefits which they do not have:**  The Defendant misrepresented that the

goods (specifically, the automotive components and restoration materials) and services (the specialized restoration labor and project management) possessed characteristics, uses, and benefits that they did not have.  Specifically, the Defendant represented that the Sham Enterprise possessed the professional capacity, skilled personnel, and proprietary "quality control" necessary to deliver a completed, roadworthy restoration.  In reality, the enterprise lacked the inventory of parts itemized in the Service Agreement, had no intention of procuring such goods, and lacked the skilled labor required to perform the restoration.  Furthermore, the "benefits" of the services—namely, the production of a high-value, restored asset—were non-existent, as the Defendant intended only to misappropriate the Plaintiff's capital without delivering the promised characteristics of the restoration. (See **Section III.C** above).

c. **§ 17.46(b)(7) – Representing that goods or services are of a particular standard, quality, or grade if they are of another:**  The Defendant misrepresented that the goods and services provided (or to be provided) were of a particular standard, quality, or grade when they were of another. Specifically, the Defendant represented that the restoration services would meet the standards of a professional automotive shop and that high-quality, genuine parts were being procured for the Vehicle. In reality, the services were of no standard or quality at all because no work was performed, and the "goods" were non-existent as the Defendant never intended to order the parts for which the Plaintiff was billed. (See **Section III.C** and **Section III.E** above).

d. **§ 17.46(b)(13) – Knowingly making false or misleading statements of fact**

**concerning the need for parts, replacement, or repair service:**  The Defendant knowingly made false and misleading statements of fact concerning the need for parts and repair services through two distinct phases of the fraud:

- o **The Initial Solicitation:** On October 17, 2024, the Defendant transmitted the Service Agreement, which itemized a specific list of automotive parts and specialized labor purportedly "needed" for the Vehicle's restoration.  This was a false statement of fact, as the Defendant knew the Enterprise had no intention of procuring those parts or performing the services.

- o **The Lulling Campaign:** In January and February 2025, the Defendant reinforced these false statements through her "lulling" representations—including the "compressing files" message—wherein she knowingly misrepresented the status and existence of invoices for parts that were never ordered.

These statements were designed to create the false impression that specific expenditures were necessary and being fulfilled, when in fact, the funds were being diverted for the Defendants' personal use. (See **Section III.C** and **Section III.E** above).

e. (false statements concerning need for parts/repair services): By way of the January–February 2025 lulling representations identified above, including the February 20, 2025 "compressing files" message and the February 21, 2025 invoicesfor-insurance message, the Defendant knowingly made false statements concerning the existence of, the need for, and the status of parts and repair

services on the Vehicle.

f. **§ 17.46(b)(24) – Failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed):** The Defendant failed to disclose material information concerning the Sham Enterprise's lack of legal existence, Steve Melton's history of adverse fraud judgments, and the pending criminal charges related to the misappropriation of other client vehicles. This information was known to the Defendant at the time of her transmitting the Service Agreement to Plaintiff, and at the time of the lulling representations. The Defendant's silence was a calculated omission intended to induce the Plaintiff into a high-value transaction that he would not have entered had these material facts been disclosed. (See **Section III.C** and **Section III.E** above).

g. The Defendant failed to disclose information concerning the Sham Enterprise's lack of legal existence, prior fraud judgment, and pending criminal charges — information known to her at the time of the transaction — with intent to induce the Plaintiff into a transaction he would not have entered had the information been disclosed.

81. The Defendant also engaged in an unconscionable action or course of action within the meaning of Tex. Bus. & Com. Code § 17.45(5) and § 17.50(a)(3) by taking advantage of the Plaintiff's lack of knowledge, ability, or experience to a grossly unfair degree — specifically, by leveraging her position as an apparent SISD employee to induce a non-Texas resident to wire $25,263.54 within twenty-four hours to a non-existent enterprise whose principal

had a publicly recorded $120,000 fraud judgment from fourteen days earlier.

82.     The Defendant's deceptive acts and unconscionable conduct were a producing cause of the Plaintiff's economic damages of not less than $251,901.57 and of his mental anguish damages, in an amount to be proven at trial

## VII.   COUNT IV: COMMON LAW FRAUD

83.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

84.     The elements of common-law fraud under Texas law are: (1) a material representation; (2) that was false; (3) which was either known to be false when made or was asserted without knowledge of its truth; (4) which was intended to be acted upon; (5) which was actually relied upon; and (6) which caused injury.[6]

85.     Each of the following statements made by the Defendant constitutes a separate and independent material misrepresentation pleaded with the particularity required by Fed. R. Civ. P. 9(b):

a.  **Statement #1 (Oct. 17, 2024, 4:54 p.m.):** By transmitting the Service Agreement from amanda.melton@sville.us to the Plaintiff, the Defendant represented to the Plaintiff that "Steve's Performance & Restoration" was a legitimate, organized restoration enterprise capable of performing the work and authorized to receive the $25,263.54 down-payment. The representation was false in that the enterprise had no legal existence, no parts inventory, no genuine intent to perform, and no track record other than fraud.  The Defendant knew it was false or made it with reckless disregard. The Defendant intended the Plaintiff to act on it, which he justifiably did, to his

---

[6] *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009).

detriment, by wiring the down-payment thirty-seven minutes later.

b. **Statement #2 (Jan. 20, 2025):** Steve Melton, acting as the Defendant's partner and co-participant in the Sham Enterprise, represented to the Plaintiff that the Defendant ("my wife") was "working on everything for us and will check everything" regarding the build sheet and invoices purportedly evidencing the parts purchased on Plaintiff's behalf.  The statement was false in that the Defendant was performing no operational or quality-control work, no parts had been procured, and no work existed to be "checked." The Defendant knew this representation was false or, at a minimum, she knowingly permitted her purported professional oversight to be used as a "lulling" tactic.  The Plaintiff justifiably relied on this assurance by forbearing from legal demand and continuing to make payments, resulting in damages including further loss of capital and lost mitigation opportunities.

c. **Statement #3 (Feb. 19–20, 2025):** Through Steve Melton, the Defendant represented to the Plaintiff that a build sheet and invoices existed and would be e-mailed by the Defendant personally upon the conclusion of her "meetings" and "school day."  The Defendant authorized and adopted this representation, using her professional status as an educator to provide a veneer of legitimacy to the delay.  The representation was false in that the documents did not exist, the parts had not been ordered, and the Defendant knew that no legitimate invoices were forthcoming.  This statement was a calculated effort by the Defendant to induce the Plaintiff's reliance and prevent him from withholding additional funds or further investigate the matter.  The Plaintiff did so rely, resulting in continued financial loss and the delayed discovery of the Defendant's misappropriation of his funds.

d. **Fraud by Non-Disclosure.** In addition to the affirmative misrepresentations identified above, the Defendant committed fraud by intentionally failing to disclose material facts that she had a duty to reveal. Specifically:

- **Duty to Correct False Impressions:** Having voluntarily entered into communications with the Plaintiff and having knowledge that Steve Melton was representing her as the "administrator" and "quality control manager" of the enterprise, the Defendant had a duty to disclose that no restoration work was being performed and no parts were being procured.

- **Concealment of Material Facts:** The Defendant intentionally remained silent regarding the Sham Enterprise's lack of legal existence and Steve Melton's documented history for misappropriating other client vehicles—facts she knew would have caused the Plaintiff to immediately cease all payments.

The Defendant remained silent with the intent to induce the Plaintiff to continue wiring funds into her joint account. The Plaintiff was ignorant of these concealed facts and did not have an equal opportunity to discover them. Had the Defendant disclosed the truth, the Plaintiff would not have entered into the transaction or continued making payments. As a result of the Defendant's silence, the Plaintiff suffered the damages identified herein.

86.    Plaintiff justifiably relied on each of the foregoing representations. The contents of the Defendant's representations — status of work, existence of invoices, identity of the responsible party — were peculiarly within the Defendant's knowledge, and the Defendant's use of the SISD institutional e-mail account on October 17, 2024 reasonably induced the Plaintiff's trust in the truthfulness of subsequent statements made by the same partner.

87.     As a direct and proximate result of the Defendant's fraudulent representations, Plaintiff has suffered actual pecuniary damages of not less than $251,901.57, plus mental anguish in an amount to be proven at trial.

88.     Because the Defendant's conduct was committed with malice and actual fraud as those terms are defined in Tex. Civ. Prac. & Rem. Code § 41.001, Plaintiff is entitled to recover exemplary damages pursuant to § 41.003

## VIII.   COUNT V: CONVERSION

89.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

90.     Plaintiff owns and has the right to immediate possession of the 1967 Chevelle and the $229,859.34 in funds provided to the Debtor for the limited purpose of restoration.

91.     The Debtor wrongfully exercised dominion and control over these assets inconsistent with Plaintiff's rights by converting the funds for unauthorized purposes and refusing to return the vehicle.

92.     Plaintiff has demanded the return of the property, but the Debtor has refused.

## IX.   COUNT VI: BREACH OF CONTRACT

93.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

94.     A valid and enforceable contract existed for the restoration of the Chevelle.

95.     Plaintiff fully performed his obligations by providing approximately $230,000.00.

96.     The Debtor breached the contract by failing to perform the restoration, failing to purchase parts, and failing to account for or return the funds.

97.     As a result, Plaintiff has suffered actual damages of at least $252,859.34.

## X.    COUNT VII: CIVIL CONSPIRACY

98.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

99.    The elements of civil conspiracy under Texas law are: (1) two or more persons; (2) an object to be accomplished (an unlawful purpose or a lawful purpose by unlawful means); (3) a meeting of the minds on the object or course of action; (4) one or more overt acts in furtherance; and (5) damages as a proximate result.[7]

### A.  Civil Conspiracy to Defraud.

100.    Two or more persons: The Defendant and Steve Melton are two distinct natural persons.

101.    Object: The object of the combination was the unlawful obtaining of the Plaintiff's 1967 Chevelle and not less than $228,901.57 in cash by means of false pretenses, false representations, and actual fraud, in violation of Texas common-law fraud, the Texas Deceptive Trade Practices Act, and the Texas Penal Code's prohibitions on theft.

102.    Meeting of the minds: A meeting of the minds between the Defendant and Steve Melton on this fraudulent object is plausibly inferred from the following well-pleaded badges of fraud: (i) the Defendant's deliberate use of her institutional SISD e-mail account on October 17, 2024 to deliver a contract on behalf of an enterprise her husband knew, and which she knew or recklessly disregarded knowing, was a fraudulent vehicle; (ii) the Defendant's acceptance of the resulting wire transfer into a joint account; (iii) the Defendant's active operational involvement during the lulling period of January–February 2025, including her direct authorship of the

---

[7] *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983).

February 20, 2025 "compressing files" message; (iv) the joint receipt and joint use of the more than $228,901.57 in customer deposits; and (v) the joint concealment of the converted Vehicle on real property the Defendant has sworn she solely owns.

103.    Overt acts in furtherance: The Defendant personally committed the following overt acts in furtherance of the fraudulent object: (a) the October 17, 2024 4:54 p.m. transmission of the Service Agreement from amanda.melton@sville.us; (b) the October 19, 2024 receipt of the $20,263.54 wire confirmation at the same e-mail address without disclaimer; (c) the January 20, 2025 quality-control and operations representation; (d) the February 19–21, 2025 build-sheet/invoices/insurance representations; (e) the February 20, 2025 "compressing files" direct text message; and (f) the post-petition omission of the Vehicle from her sworn bankruptcy schedules.

104.    Damages: Plaintiff has been damaged in the amount of not less than $251,901.57 as a direct and proximate result of the conspiracy.

105.    Because the Defendant participated in a civil conspiracy with Steve Melton, she is jointly and severally liable for all acts of Steve Melton committed in furtherance of the conspiracy.[8]

**B.  Civil Conspiracy to Convert**

106.    The Debtor and her husband, Steve Melton, combined to accomplish an unlawful purpose: the conversion of the Plaintiff's funds and the 1967 Chevelle.

107.    There was a meeting of the minds to engage in this course of action, and the Debtor committed multiple overt acts in furtherance of the conspiracy, including the receipt and concealment of funds and the retention and concealment of the Vehicle on real property she has

---

[8] *See Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996).

sworn she solely owns.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Richard Kevin Brown respectfully requests that this Court, after a trial on the merits, enter a Final Judgment in favor of Plaintiff and against Defendant Amanda Mae Melton as follows:

1.   **Liquidation of State Law Claims:** Finding that the Defendant is jointly and severally liable to Plaintiff for: (a) actual damages of not less than $251,901.57 on Counts III (DTPA), IV (common-law fraud), V (conversion), VI (breach of contract), and VII (civil conspiracy); (b) treble damages on Count VI pursuant to Tex. Bus. & Com. Code § 17.50(b)(1); (c) exemplary damages on Count VII pursuant to Tex. Civ. Prac. & Rem. Code §§ 41.001–41.003; (d) mental-anguish damages in an amount to be proven at trial; and (e) pre- and post-judgment interest at the maximum rate allowed by law;

2.   **Non-Dischargeability Under § 523(a)(2)(A) (Count I):** Determining that the entire debt liquidated under Paragraph 1 above — including actual damages, treble damages, exemplary damages, attorneys' fees, costs, and interest — is non-dischargeable under 11 U.S.C. § 523(a)(2)(A) because it was obtained by false pretenses, false representation, and actual fraud, by the Defendant individually and by Steve Melton acting within the scope of the partnership pleaded herein;

3.   **Non-Dischargeability Under § 523(a)(6) (Count II):** Determining that the entire debt liquidated under Paragraph 1 above is non-dischargeable under 11 U.S.C. § 523(a)(6) because it arises from the Defendant's willful and malicious injury to the Plaintiff and to the Plaintiff's property;

4.   **Attorneys' Fees and Costs:** Awarding Plaintiff his reasonable and necessary

attorneys' fees and costs as mandated by Tex. Bus. & Com. Code § 17.50(d) and as otherwise

allowed by law; and

5.  **General Relief:** Granting Plaintiff such other and further relief, at law or in

equity, to which he may show himself justly entitled.

Respectfully submitted,

THE ALLEN FIRM, P.C.

By:/s/ **Cassie M Meyer**

Cassie M Meyer, Esq.
Texas Bar No. 24140549
Email: cassie@allenlawfirm.com
181 S. Graham Street
Stephenville, Texas 76401
Tel: (254) 965-3185
Fax: (254) 965-6539
ATTORNEYS FOR RICHARD KEVIN BROWN, CREDITOR

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of May 2026, a true and correct copy of the foregoing
PLAINTIFF'S THIRD AMENDED ADVERSARY COMPLAINT was served electronically via
the Court's CM/ECF system upon all parties registered to receive electronic notice in this case,
including:

Clayton L. Everett
Norred Law, PLLC
clayton@norredlaw.com
*Counsel for Defendant/Debtor*

By:/s/ **Cassie M Meyer**

Cassie M Meyer